UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LAMONT EUGENE JONES,
o/b/o K.D.W.,

       Plaintiff,                        CIVIL ACTION NO. 12-10482

   v.                                DISTRICT JUDGE JOHN CORBETT O'MEARA

COMMISSIONER OF           MAGISTRATE JUDGE MARK A. RANDON
SOCIAL SECURITY,

       Defendant.
_____/

**REPORT AND RECOMMENDATION
ON CROSS-MOTIONS FOR SUMMARY JUDGMENT (DKT. NOS. 12 and 16)**

**I.    PROCEDURAL HISTORY**

*A.    Proceedings in this Court*

On February 3, 2012, Plaintiff Lamont Jones ("Plaintiff") filed suit on behalf of his minor son, K.D.W., seeking judicial review of the Commissioner's decision to deny K.D.W. social security benefits (Dkt. No. 1). Pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.1(b)(3), the matter was referred to this Magistrate Judge for a report and recommendation (Dkt. No. 4). Cross-motions for summary judgment are pending (Dkt. Nos. 12, 16).

*B.    Administrative Proceedings*

Plaintiff applied for supplemental security income ("SSI") on December 12, 2008, alleging K.D.W. became disabled on September 1, 2006. The application was initially denied by the Commissioner on March 23, 2009 (Tr. 17). On April 7, 2010, Plaintiff and K.D.W. appeared with counsel for a hearing before Administrative Law Judge ("ALJ") Henry Perez, Jr., who considered the case *de novo*. On September 24, 2010, the ALJ found that K.D.W. was not

disabled (Tr. 17-29). Plaintiff requested a review of this decision (Tr. 1). On December 2, 2011, the ALJ's decision became the final decision of the Commissioner when the Appeals Council denied Plaintiff's request for further review (Tr. 1-3).

In light of the entire record in this case, it is **RECOMMENDED** that Plaintiff's motion for summary judgment be **GRANTED**, Defendant's motion for summary judgment be **DENIED**, and the case be **REMANDED** to the Commissioner.

## II.     STATEMENT OF FACTS

### A.     ALJ Findings

K.D.W. was born on June 17, 2000 and was considered a school-age child when the application was filed in 2008 (Tr. 20).

The ALJ applied a three-step sequential evaluation process to determine whether K.D.W. was disabled (Tr. 17). At step one, the ALJ determined that K.D.W. had not engaged in substantial gainful activity (Tr. 20).

At step two, the ALJ found that K.D.W. had the following "severe" impairments: Attention Deficit Hyperactivity Disorder ("ADHD") and Oppositional Defiant Disorder[1] ("ODD") (Tr. 20).

At step three, the ALJ found that K.D.W. did not have an impairment or combination of impairments that met or medically equaled one of the listings in the regulations (Tr. 20).

The ALJ next determined the degree of limitation in each of six functional domains, and found that K.D.W. did not have an impairment or combination of impairments that functionally equaled any of the listings. The ALJ's specific findings as to the six functional domains were:

---

[1] Oppositional Defiant Disorder is when a child has a persistent pattern of tantrums, arguing, and angry or disruptive behavior toward parents or other authority figures. http://www.mayoclinic.com/health/oppositional-defiant-disorder/DS00630 (last visited January 3, 2013).

Acquiring and Using Information (less than marked limitation); Attending and Completing Tasks (less than marked limitation); Interacting and Relating with Others (less than marked limitation); Moving About and Manipulating Objects (no limitation); Caring for Yourself (less than marked limitation); and Health and Physical Well-Being (no limitation) (Tr. 24-28). Accordingly, the ALJ found K.D.W. was not disabled (Tr. 28).

### B.  *Administrative Record*

#### 1.  **K.D.W.'s Testimony & Statements**

On the administrative hearing date, K.D.W. was nine years old and in the fourth grade (Tr. 33). According to K.D.W., he does not do well in school and is in special education math (Tr. 33-34). He has three friends at school; but, at home, he only plays with a four or five year old boy (Tr. 34, 38). K.D.W. testified that he fights with his siblings. He was also suspended from school for fighting (Tr. 34-35).

#### 2.  **Plaintiff's Testimony & Statements**

Plaintiff testified that K.D.W. does not complete assignments at school; he does not sit down, disrupts the class, performs poorly in reading and writing and does not get along with his teachers or classmates (Tr. 36, 40-41). K.D.W. does not understand instructions or follow school rules (Tr. 41). He frequently gets suspended from school: at least once a month and 10-12 times over the past six months (Tr. 43-44).

At home, Plaintiff expects K.D.W. to keep his room clean, take out the trash, and wash dishes, but he does not comply (Tr. 37). K.D.W. argues with his siblings and his stepmother (Tr. 37, 42). Plaintiff testified that K.D.W.'s younger brother had a "nice gash in his head" after K.D.W. threw him from one bed to the other (Tr. 37). K.D.W. also set his mattress on fire, put

holes in his stuffed animals to hump them and was caught engaging in sexual activity with his cousins (Tr. 37-38).

Plaintiff testified that he first noticed K.D.W. had ADHD symptoms when K.D.W. was in the first grade (Tr. 41).

According to Plaintiff, K.D.W. plays video games and rides his bike, but he does not like to read (Tr. 42). K.D.W. can fix a bowl of cereal, make a sandwich, and get dressed (although sometimes his clothes are dirty, and Plaintiff has to tell him what to wear); Plaintiff does not allow K.D.W. to use the microwave or cook (Tr. 43).

### 3. Treatment History and School Records

On February 7, 2008, it was noted that K.D.W. has a learning disability (Tr. 137). On February 23, 2008, K.D.W. exhibited symptoms of ADHD: his concentration and focus were poor; he did not follow instructions or complete classroom assignments; his behavior was impulsive and hyperactive; and he had poor grades (Tr. 136).

On March 31, 2008, K.D.W. showed poor judgment, insight and impulse control (Tr. 110). He also displayed symptoms of ODD, including temper tantrums, active defiance and refusal to comply with adult requests and rules (Tr. 112). K.D.W. was diagnosed with ODD in June 2008 (Tr. 116).

On July 5, 2008, K.D.W. was discharged from Eastwood Clinics after five treatment sessions with a diagnosis of ODD (Tr. 108). However, he made progress in his disruptive behaviors; his behavior at school was improving, and he was working at expressing his feelings in the appropriate manner (Tr. 108).

On August 1, 2008, K.D.W. was diagnosed with ADHD; he lacked personal judgment, and was severely withdrawn, sad, and depressed (Tr. 160-161). On August 25, 2008, K.D.W.

had a Psychiatric Evaluation due to hyperactivity, poor focus, and aggressive and impulsive behavior. It was noted that K.D.W. pushed his niece down the stairs, resulting in her hospitalization (Tr. 164). K.D.W. was prescribed Concerta to control his ADHD (Tr. 166).

On November 3, 2008, K.D.W. was evaluated to determine his eligibility for special education services (Tr. 96-100). The psychologist found that K.D.W.'s overall cognitive ability was within the low average range; his general verbal comprehension abilities were within the low average range; his general perceptual reasoning abilities were within the average range; and he was performing at the kindergarten level in math reasoning (three or more years below his same age peers) (Tr. 100). The evaluation supported a recommendation for special education (Tr. 100).

On December 16, 2008, an Individualized Education Program Team Report confirmed that K.D.W. was eligible for special education due to a specific learning disability (Tr. 139). He was making poor progress in the general education curriculum (Tr. 140). Accordingly, his school work was modified to provide for small group learning, extended time to complete assignments, repeated directions and use of a calculator (Tr. 141). K.D.W. was to have general education class 25 hours per week and special education five hours a week (Tr. 141).

On January 26, 2009, K.D.W.'s third-grade teacher indicated that K.D.W. could read at a second-grade level and write at a first-grade level (Tr. 88). She further indicated that K.D.W.: has "no problem" interacting and relating with others, paying attention when spoken to directly, and waiting to take turns (Tr. 90, 92); has a "slight problem" comprehending oral instructions, providing organized oral explanations and adequate descriptions, recalling and applying previously learned material, carrying out single-step instructions, working without distracting himself or others, and applying problem-solving skills in class discussions; has an "obvious

problem" understanding school and content vocabulary, refocusing to task when necessary, carrying out multi-step instructions, changing from one activity to another without being disruptive, organizing his own things or school materials, working at a reasonable pace or finishing on time, and learning new material; has a "serious problem" reading and comprehending written material, focusing long enough to finish an assigned activity or task, understanding and participating in class discussions, and expressing ideas in written form; and has a "very serious problem" completing class/homework assignments, and completing work accurately without careless mistakes (Tr. 89-90). Finally, she indicated that on some days, K.D.W. cannot be still or stay in his seat long enough to focus (Tr. 94).

On February 11, 2009, K.D.W. had a mental status examination (Tr. 175-179). It was noted that he was "passed" from second grade with straight F's (Tr. 179). K.D.W. reported he cannot keep friends, does not get along with his teachers and he bickers with his sisters (Tr. 177). K.D.W. frequently liked to be alone (Tr. 177). He was diagnosed with ADHD (Tr. 179). However, he was doing better with treatment and medication (Tr. 179).

A child disability evaluation form was completed on March 14, 2009; K.D.W. manifested less than marked impairments in acquiring and using information, attending and completing tasks, interacting and relating with others, and caring for oneself. He had no limitations in moving about and manipulating objects, and health and physical well-being (Tr. 184-185).

On November 19, 2009, K.D.W. was suspended from school for loitering in the halls and not reporting to class on time (Tr. 211). On December 3, 2009, K.D.W. was suspended for stealing pencils; on December 4, 2009, he was suspended for trespassing (Tr. 209-210). K.D.W. was suspended again on March 16, 2010 for disruptive misconduct and insubordination (Tr. 207).

On December 16, 2009, testing reveled that K.D.W. was performing at a 1.9 grade equivalence in math (Tr. 194). The report further stated that K.D.W. "does not have many days where he has success" (Tr. 194).

On February 25, 2010, Plaintiff reported that when K.D.W. was taking his medication, his grades improved and Plaintiff received fewer phone calls regarding his behavior at school (Tr. 203).

K.D.W.'s report card for the period ending April 16, 2010 includes comments that he is achieving below his apparent ability, his poor attendance is affecting his work, he is very disruptive, has incomplete assignments, and poor study habits. (Tr. 249). The report card for the second card marking consists of four D's (Handwriting, Math, Science, and Social Studies), three D-'s (English, Spelling and Reading), one C (Computer Application), and one F (Homework). The report card for the third card marking consists of two C-'s (Social Studies and Science), four F's (Spelling, Homework, English, and Reading), two D's (Handwriting and Math), and one A (Vocal Music) (Tr. 249).

### C. *Plaintiff's Claims of Error*

Plaintiff argues that the ALJ's decision is not supported by substantial evidence in the record and is contrary to the Social Security Act. Specifically, Plaintiff argues that the ALJ committed reversible legal error when he evaluated the first three domains of Acquiring and Using Information, Attending and Completing Tasks, and Interacting and Relating with Others.

## III. DISCUSSION

### A. *Standard of Review*

In enacting the Social Security system, Congress created a two-tiered system in which the administrative agency handles claims, and the judiciary merely reviews the agency determination

for exceeding statutory authority or for being arbitrary and capricious. *See Sullivan v. Zebley*, 493 U.S. 521 (1990). The administrative process itself is multifaceted in that a state agency makes an initial determination that can be appealed first to the agency itself, then to an ALJ, and finally to the Appeals Council. *See Bowen v. Yuckert*, 482 U.S. 137 (1987). If relief is not found during this administrative review process, the claimant may file an action in federal district court. *Id.*; *Mullen v. Bowen*, 800 F.2d 535, 537 (6th Cir. 1986).

This Court has original jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited in that the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). In deciding whether substantial evidence supports the ALJ's decision, "we do not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). "It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003) (an "ALJ is not required to accept a claimant's subjective complaints and may . . . consider the credibility of a claimant when making a determination of disability"); *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (the "ALJ's credibility determinations about the claimant are to be given great weight, particularly since the ALJ is charged with observing the claimant's demeanor and credibility") (internal quotation marks omitted); *Walters*, 127 F.3d at 531 ("Discounting credibility to a

certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence"). "However, the ALJ is not free to make credibility determinations based solely upon an 'intangible or intuitive notion about an individual's credibility.'" *Rogers*, 486 F.3d at 247, quoting, Soc. Sec. Rul. 96-7p, 1996 WL 374186, *4.

If supported by substantial evidence, the Commissioner's findings of fact are conclusive. 42 U.S.C. § 405(g). Therefore, this Court may not reverse the Commissioner's decision merely because it disagrees or because "there exists in the record substantial evidence to support a different conclusion." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (*en banc*). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers*, 486 F.3d at 241; *Jones*, 336 F.3d at 475. "The substantial evidence standard presupposes that there is a 'zone of choice' within which the Commissioner may proceed without interference from the courts." *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citing *Mullen*, 800 F.2d at 545).

The scope of this Court's review is limited to an examination of the record only. *See Bass*, 499 F.3d at 512-13; *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). When reviewing the Commissioner's factual findings for substantial evidence, a reviewing court must consider the evidence in the record as a whole, including that evidence which might subtract from its weight. *See Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). "Both the court of appeals and the district court may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or the reviewing court must discuss every piece of evidence in the administrative record. *See Kornecky v. Comm'r of*

*Soc. Sec.*, 167 Fed. Appx. 496, 508 (6th Cir. 2006) ("[a]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party") (internal citation marks omitted); *see also Van Der Maas v. Comm'r of Soc. Sec.*, 198 Fed. Appx. 521, 526 (6th Cir. 2006).

### B. Governing Law

The "[c]laimant bears the burden of proving his entitlement to benefits." *Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994); *accord, Bartyzel v. Comm'r of Soc. Sec.*, 74 Fed. Appx. 515, 524 (6th Cir. 2003). There are several benefits programs under the Act, including the Disability Insurance Benefits Program ("DIB") of Title II (42 U.S.C. §§ 401 *et seq*.) and the Supplemental Security Income Program ("SSI") of Title XVI (42 U.S.C. §§ 1381 *et seq*.). Title II benefits are available to qualifying wage earners who become disabled prior to the expiration of their insured status; Title XVI benefits are available to poverty stricken adults and children who become disabled. F. Bloch, *Federal Disability Law and Practice* § 1.1 (1984). While the two programs have different eligibility requirements, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); *see also*, 20 CFR § 416.905(a) (SSI).

Although the standard of review of the Commissioner's decision is the same, children's disability claims are reviewed under criteria different from adults. There is no five step evaluation. Instead, pursuant to the 1996 enactment of the Personal Responsibility and Work Opportunity Reconciliation Act, which changed the definition of disability for children seeking

Social Security benefits, *see* 42 U.S.C. § 1382c(a)(3)(c), there is a three step sequential process in determining whether a child is "disabled." First, the child must not be engaged in substantial gainful activity; second, the child must have a severe impairment; and third, the severe impairment must meet, medically equal or functionally equal one of the impairments found in 20 C.F.R. Part 404, Subpart P, Appendix 1. *See* 20 C.F.R. § 416.924. In order to be found disabled based upon a listed impairment, the claimant must exhibit all the elements of the listing. *See* 20 C.F.R. § 416.924(a); *Hale v. Sec'y of Health & Human Servs.*, 816 F.2d 1078, 1083 (6th Cir.1987). It is insufficient that a claimant comes close to meeting the requirements of a listed impairment. *See Dorton v. Heckler*, 789 F.2d 363, 367 (6th Cir. 1986).

Under section 416.926a, if a child's impairment or combination of impairments does not meet or is not medically equivalent in severity to a listed impairment, then the Commissioner will assess all functional limitations caused by the impairment to determine if the child's impairments are *functionally equivalent in severity to any of the listed impairments* of Appendix 1. (20 C.F.R. § 404, subpt. P, app. 1) (emphasis added). The following areas of development (referred to as "domains") are considered in determining whether a child's impairments are functionally equivalent to a listed impairment: (1) Acquiring and Using Information; (2) Attending and Completing Tasks; (3) Interacting and Relating with Others; (4) Moving About and Manipulating Objects; (5) Caring for Yourself; and (6) Health and Physical Well Being. *See* 20 C.F.R. § 416.926a. A finding of functional equivalence to a listed impairment is warranted when the child has an extreme limitation in one domain of functioning or marked limitations in two domains of functioning. *See* 20 C.F.R § 416.926a(d).

### C.     Analysis and Conclusions

As discussed above, to establish a disability under the standards for SSI child's benefits, Plaintiff must show that K.D.W.'s impairment resulted in "marked" limitations in two functional domains or an "extreme" limitation in one domain. 20 CFR § 416.926a(a). The regulations provide:

> We will find that you have a "marked" limitation in a domain when your impairment(s) interferes seriously with your ability to independently initiate, sustain, or complete activities. Your day-to-day functioning may be seriously limited when your impairment(s) limits only one activity or when the interactive and cumulative effects of your impairment(s) limit several activities. "Marked" limitation also means a limitation that is "more than moderate" but "less than extreme." It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean.
>
> .   .   .
>
> We will find that you have an "extreme" limitation in a domain when your impairment(s) interferes very seriously with your ability to independently initiate, sustain, or complete activities. Your day-to-day functioning may be very seriously limited when your impairment(s) limits only one activity or when the interactive and cumulative effects of your impairment(s) limit several activities. "Extreme" limitation also means a limitation that is "more than marked." "Extreme" limitation is the rating we give to the worst limitations. However, "extreme limitation" does not necessarily mean a total lack or loss of ability to function. It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least three standard deviations below the mean.

20 CFR §§416.926a(e)(2)(i) and 416.926a(e)(3)(i).

### 1.     The ALJ Erred in Assessing the First Functional Domain (Acquiring and Using Information)

The ALJ found that K.D.W. suffered from "less than marked" limitation in his ability to acquire and use information. Plaintiff argues that this finding is not supported by substantial evidence.

-12-

The regulations state the following with regard to the acquiring and using information domain:

> In the domain of "Acquiring and using information," we consider a child's ability to learn information and to think about and use the information.
>
> . . .
>
> Because much of a . . . school-age child's learning takes place in a school setting, . . . school records are often a significant source of information about limitations in the domain of "Acquiring and using information." Poor grades or inconsistent academic performance are among the more obvious indicators of a limitation in this domain provided they result from a medically determinable mental or physical impairment(s). Other indications in school records that a mental or physical impairment(s) may be interfering with a child's ability to acquire and use information include, but are not limited to:
>
> •   <u>Special education services</u>, such as assignment of a personal aide who helps the child with classroom activities in a regular classroom, remedial or compensatory teaching methods for academic subjects, or placement in a self-contained classroom.
>
> •   <u>Related services</u> to help the child benefit from special education, such as occupational, physical, or speech/language therapy, or psychological and counseling services.
>
> •   <u>Other accommodations</u> made for the child's impairment(s), both inside and outside the classroom, such as front-row seating in the classroom, more time to take tests, having tests read to the student, or after-school tutoring.
>
> The kind, level, and frequency of special education, related services, or other accommodations a child receives can provide helpful information about the severity of the child's impairment(s). However, the lack of such indicators does not necessarily mean that a child has no limitations in this domain. [W]hen we assess a child's abilities in any of the domains, we must compare the child's functioning to the functioning of same-age children without impairments based on all relevant evidence in the case record.
>
> Although we consider formal school evidence (such as grades and aptitude and achievement test scores) in determining the severity of a child's limitations in this domain, we do not rely solely on such measures. We also consider evidence about the child's ability to learn and think from medical and other non-medical sources (including the child, if the child is old enough to provide such information), and we assess limitations in this ability in all settings, not just in school.

. . .

> To . . . assist adjudicators in evaluating a child's impairment-related limitations in the domain of "Acquiring and using information," we . . . provide the following examples of some of the limitations we consider in this domain.
>
> . . .
>
> •   Is not reading, writing, or doing arithmetic at appropriate grade level.
>
> •   Has difficulty comprehending written or oral directions.
>
> •   Struggles with following simple instructions.

SSR 09-3p.

The ALJ stated the following with respect to K.D.W.'s ability to "acquire and use information":

> [K.D.W.] was administered ten subtests of the Wechsler Intelligence Scale for Children. His general cognitive ability is within the Low Average range, (86), as measured by the Full Scale Intelligence Quotient. [K.D.W.] has an Individualized Education Plan, effective January 20, 2009, pursuant to which he attends special education class for learning disability. However, [K.D.W.] only attends special education class for 5 hours out of 30 hours per week. The remaining 25 hours are spent in general education classes. The Teacher Questionnaire reveals that [K.D.W.] only has a slight problem comprehending oral instructions, providing organized oral explanations and adequate descriptions, recalling and applying previously learned material, and applying problem-solving skills in class discussions. His most severe problems are in reading and comprehending written material, and expressing ideas in written form. [K.D.W.] was able to repeat 4 digits forward and 3 digits backward. In fact, Dr. Boneff found that [K.D.W.] displayed some strengths in cognitive functions such as abstract thinking. [K.D.W.'s] immediate and short-term memory is fairly good. The evidence, taken as a whole, supports a finding of less than marked limitation of [K.D.W.'s] ability to acquire and use information.

(Tr. 24).

This Magistrate Judge finds the ALJ did not follow SSR 09-3p, which specifically states the ALJ must consider K.D.W.'s poor grades;[2] other accommodations made for K.D.W.'s impairments; and the fact that K.D.W. was not reading, writing, or doing math at the appropriate grade level.[3] Accordingly, the case should be remanded so the ALJ can more fully consider K.D.W.'s report card markings and other evidence surrounding his poor grades; the fact that K.D.W.'s school work had to be modified to provide for small group learning, extended time to complete assignments, repeated directions, and use of a calculator; and the fact that K.D.W.'s reading, writing, and math skills were below his grade level.

### 2. The ALJ Did Not Err in Assessing the Second Functional Domain (Attending and Completing Tasks)

The ALJ found that K.D.W. suffered from "less than marked" limitation in his ability to attend and complete tasks, and Plaintiff argues that this finding is not supported by substantial evidence.

The regulations state the following with regard to the attending and completing tasks domain:

> In the domain of "Attending and completing tasks," we consider a child's ability to focus and maintain attention, and to begin, carry through, and finish activities or tasks. We consider the child's ability to initiate and maintain attention, including the child's alertness and ability to focus on an activity or task despite distractions, and to perform tasks at an appropriate pace. We also consider the child's ability to change focus after completing a task and to avoid impulsive

---

[2] While the ALJ mentioned Plaintiff's testimony that K.D.W. performs poorly in school (Tr. 21), this Magistrate Judge cannot tell whether this testimony was taken into account when the ALJ evaluated the acquiring and using information domain. More importantly, the ALJ's decision does not account for K.D.W.'s report card markings.

[3] The ALJ mentioned that K.D.W. has poor reading and writing skills (Tr. 21). However, he did not mention that when K.D.W. was in the third grade, he was reading at a second-grade level and writing at a first-grade level.

thinking and acting. Finally, we evaluate a child's ability to organize, plan ahead, prioritize competing tasks, and manage time.

. . .

As in any domain, when we evaluate a child's limitations in the domain of "Attending and completing tasks," we consider how appropriately, effectively, and independently the child functions compared to children of the same age who do not have impairments. For example, a teacher may report that a child "pays attention well with frequent prompting." The need for frequent prompting demonstrates that the child is not paying attention as appropriately, effectively, or independently as children of the same age who do not have impairments. Despite the fact that the child is paying attention with prompting, this child is not functioning well in this domain.

The domain of "Attending and completing tasks" covers only the mental aspects of task completion; such as the mental pace that a child can maintain to complete a task. Therefore, limitations in the domain of "Attending and completing tasks" are most often seen in children with mental disorders. For example, in school:

- Children with attention-deficit/hyperactivity disorder (AD/HD) whose primary difficulty is <u>inattention</u> may be easily distracted or have difficulty focusing on what is important and staying on task. They may fail to pay close attention to details and make careless mistakes in schoolwork, avoid projects that require sustained attention, or lose things needed for school or other activities beyond what is expected of children their age who do not have impairments.

- Children with AD/HD whose primary difficult is <u>hyperactivity</u> and <u>impulsivity</u> may fidget with objects instead of paying attention, talk instead of listening to instructions, or get up from their desks and wander around the classroom beyond what is expected of children their age who do not have impairments.

. . .

To . . . assist adjudicators in evaluating a child's impairment-related limitations in the domain of "Attending and completing tasks," we . . . provide the following examples of some of the limitations we consider in this domain.

. . .

- Repeatedly becomes sidetracked from activities or frequently interrupts others.

- Needs extra supervision to stay on task.

SSR 09-4p.

> The ALJ found the following with respect to this domain:
>
> When being tested by Jacklyn Butler, School Psychologist, on November 3, 2008, [K.D.W.] demonstrated persistence and did not give up easily when solving tasks and answering questions. The Teacher Questionnaire reveals that [K.D.W.'s] most severe problems are focusing and finishing accurately his homework or task. [K.D.W.] has no problem paying attention when spoken to directly, and only a slight problem in carrying out single-step directions and working without distracting self or others. He did exhibit an obvious problem in refocusing, carrying out multi-step instructions, changing from one activity to another without being disruptive, organizing his own things or school materials, and finishing on time . . ., but the School Psychologist noted that [K.D.W.] tried hard to succeed on the day she examined him. [K.D.W.] was able to testify at the hearing. He stayed focused and was able to articulate his thoughts to the [ALJ]. Moreover, when examined by the consultative examiner, Nick Boneff, Ph.D., L.P., he sat still during the examination and was reasonably cooperative. Claire Stoker, M.D., psychiatrist at the Arab-American and Chaldean Council also examined [K.D.W.] on February 25, 2010, and found that although he showed some fidgeting in his chair, he was able to stay in his seat throughout the appointment. The evidence as a whole indicates [K.D.W.] has less than marked limitation in attending and completing tasks.

(Tr. 25). Plaintiff says the ALJ focused on settings in which K.D.W. was involved in a one-on-one evaluation and did not consider the fact that K.D.W. was very playful; had poor grades, study habits, and attendance; neglected class work; had trouble staying on task; was very disruptive; achieved below his apparent ability; argued a lot; blamed others; had temper tantrums; refused to follow directions; talked excessively; had to be reminded to do things; and was physically aggressive.

This Magistrate Judge agrees with Plaintiff that there is evidence to support a different conclusion, but finds the ALJ acted within his "zone of choice" and supported his decision with substantial evidence. Accordingly, this Magistrate Judge declines to disturb the ALJ's findings.

### 3. The ALJ Erred in Assessing the Third Functional Domain (Interacting and Relating with Others)

The ALJ found that K.D.W. suffered from "less than marked" limitation in his ability to interact and relate with others, and Plaintiff argues that this finding is not supported by substantial evidence.

The regulations state the following with regard to the attending and completing tasks domain:

> In the domain of "Interacting and relating with others," we consider a child's ability to initiate and respond to exchanges with other people, and to form and sustain relationships with family members, friends, and others. This domain includes all aspects of social interaction with individuals and groups at home, at school, and in the community.  Important aspects of both interacting and relating are the child's response to persons in authority, compliance with rules, and regard for the possessions of others.
>
> . . .
>
> Children with impairment-related limitations in this domain may not be disruptive; therefore, their limitations may go unnoticed. Such children may be described as socially withdrawn or isolated, without friends, or preferring to be left alone. These children may simply not understand how to accomplish social acceptance and integration with other individuals or groups.  However, because children achieve much of their understanding about themselves and the world from their interactions, the impairment-related limitations of children who withdraw from social interaction may be as significant as those of children whose impairments cause them to be disruptive.
>
> . . .
>
> To . . . assist adjudicators in evaluating a child's impairment-related limitations in the domain of "Interacting and relating with others," we . . . provide the following examples of some of the limitations we consider in this domain.
>
> . . .
>
> • Has no close friends, or has friends who are older or younger.

SSR 09-5p.

The ALJ stated the following regarding this domain:

> [K.D.W.'s] father testified that [K.D.W.] gets in fights with his siblings, has been suspended from school for fighting, and argues with his siblings and stepmother. [K.D.W.] admitted that he does get in fights with his siblings "because they hit me." However, it has not been necessary to implement behavior modification strategies for [K.D.W.]. The school psychologist recommended that [K.D.W.] be assigned with specific students with whom he works best. As far as speech, [K.D.W.] can be understood on the first attempt, when the topic is known; but when the topic is unknown, repetition or rephrasing is necessary. Taken as a whole, the evidence establishes that [K.D.W.] has less than a marked limitation in interacting and relating with others.

(Tr. 27).

This Magistrate Judge agrees with Plaintiff that there is evidence to support a different conclusion. However, while the ALJ need not discuss every piece of evidence in the administrative record, *see Kornecky*, 167 Fed. Appx. at 508, he failed to consider the fact that K.D.W's friend is much younger than K.D.W., as required by SSR 09-5p. Accordingly, this case should be remanded for consideration of that fact.

## IV.     RECOMMENDATION

Based on the foregoing, it is **RECOMMENDED** that Plaintiff's motion for summary judgment be **GRANTED**, Defendant's motion for summary judgment be **DENIED**, and that case be **REMANDED** to the Commissioner.

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981). The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party

might have to this Report and Recommendation. *See Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be no more than 20 pages in length unless, by motion and order, the page limit is extended by the court. The response shall address each issue contained within the objections specifically and in the same order raised.

s/Mark A. Randon  
Mark A. Randon  
United States Magistrate Judge

Dated: January 11, 2013

*Certificate of Service*

*I hereby certify that a copy of the foregoing document was mailed to the parties of record on this date, January 11, 2013, by electronic and/or ordinary mail.*

s/Melody R. Miles  
*Case Manager to Magistrate Judge Mark A. Randon*  
(313) 234-5540